**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

IN RE PHARMACIELO LTD.
SECURITIES LITIGATION

Case Number: 2:20-cv-02182-PSG-JC

**CLASS ACTION**

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff PharmaCielo Investor Group[1] ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding PharmaCielo Ltd. ("PharmaCielo" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded PharmaCielo securities from June 21, 2019 and March 2, 2020, both dates inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

---

[1] Comprised of Howard Anderson and Pamela Que.

2.     PharmaCielo has one operating subsidiary, PharmaCielo Colombia, and describes its business as cultivating, processing and supplying all-natural medicine-grade cannabis oil extracts to large channel distributors via its greenhouse facilities in Colombia.

3.     PharmaCielo has represented at all relevant times on its website that its main growing and processing operations are located at its facility in Rionegro, Colombia. PharmaCielo Colombia owns 2 properties-- 12 hectares of open-air greenhouses and a processing & extraction facility situated on a 27-hectare property in Rionegro, and a 3.6-hectare property in Northeastern Cauca.

4.     The Company did not earn any revenue prior to 2019 and indicated in its second quarter financial results, filed on August 27, 2019, that it still "has no operating revenues."   The Company also experienced significant and continued cash burn throughout the Class Period, amounting to approximately $7 million[2] a quarter.   For example, its cash and cash equivalents decreased from $13,673,299 as of December 31, 2019 to $6,039,908 as of March 31, 2020.   In each financial statement the Company issued during the Class Period, it purported to list every related party transaction.

5.     Throughout the Class Period, the Company repeatedly told investors that it was successfully scaling up its Colombian operation and expanding capacity to allow it to enter into, and meet obligations under, sales agreements and distribution agreements

---

[2] All dollar amounts set forth herein are reflected in Canadian dollars in accordance with PharmaCielo's financial statements.

facilitating the growth of its business in the U.S., Latin America, and Europe.  Specifically, Defendants told investors about efforts to construct a research technology and processing center ("Research Technology and Processing Centre"), which it assured investors would be ready in 2019, and which would contain facilities to: (i) dry flowers naturally and by using drying machines; (ii) a milling area; (iii) extraction areas; and (iv) an area designed for testing for levels of THC and CBD levels in cannabis as well as for general compliance.

6.    Given the Company's lack of revenue and assurances of continued efforts to scale up operations, the market paid particular attention when, on September 25, 2019, PharmaCielo announced a $3 million sales agreement for the remainder of 2019 with General Extract LLC ("General Extract"), which it touted as the Company's "initial foray into the coveted United States market as a supplier of medicinal-grade CBD isolate."  The Company earned only $786,901 in total revenue in 2019, but its reported net income for the year reflected a $34,667,341 loss.

7.    Then, in January 2020, PharmaCielo trumpeted a distribution agreement it had entered with XPhyto Therapeutics Corp., pursuant to which PharmaCielo claimed it would "supply medicinal-quality cannabis extract oils and isolates, including those containing THC, to XPhyto for analysis, further processing, product development and manufacturing at its European Union Good Manufacturing Practice certified ("EU GMP") facility in Biberach in the state of Baden-Württemberg, and thereafter for sale into the German market."

8.      However, Defendants' Class Period statements, set forth in detail below, were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the agreement with purported multi-state distributor General Extract—a company with no apparent credible operations—qualified as a related party transaction with PharmaCielo's former Chief Operations Officer; two large shareholders in General Extract's parent company, Carlos Manuel Uribe (Lalinde) and Andres (Fernandez) Acosta, are directors at PharmaCielo; and one large shareholder in General Extract's parent company, Miguel Cock-Gomez, is the son of PharmaCielo co-founder Federico Cock-Correa; (ii) PharmaCielo had significantly overstated the efficacy and competitiveness of the Company's business and operations in South America, including Peru and Columbia; and (iii) PharmaCielo had entered into a misleading transaction with XPhyto, a nearly insolvent company run by a CEO with a history of running companies into the ground, pursuant to which PharmaCielo provided XPhyto with  money it could roundtrip back to the Company to buy product. Moreover, in touting its operations and efforts to expand, Defendants misrepresented and failed to disclose that (i) PharmaCielo faced significant delays in the construction of its Research Technology and Processing Centre; (ii) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; and

(iii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle.

## **JURISDICTION AND VENUE**

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

13.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

14.     Lead Plaintiff, as set forth in certifications previously filed with this Court, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

15.     Defendant PharmaCielo, through its subsidiary, PharmaCielo Colombia Holdings S.A.S., purports to cultivate, process, produce, and supply medicinal-grade cannabis oil extracts and related products in Colombia and internationally.

16.     The Company is incorporated in Canada and its head office is located at 1 Toronto Street, Suite 805, Toronto, Ontario, Canada M5C 2E3.  PharmaCielo's securities trade on the OTCQX Best Market ("OTCGX") under the ticker symbol "PCLOF" and previously traded under the ticker symbol "PHCEF."

17.     Defendant David Attard ("Attard") served as the Company's Chief Executive Officer ("CEO") and as a Director during the Class Period.

18.     Defendant Scott Laitinen ("Laitinen") served as the Company's Chief Financial Officer ("CFO") during the Class Period.

19.     Defendant David Gordon ("Gordon") served as the Company's Chief Corporate Officer ("CCO") during the Class Period.

20.     Defendant Andrés Botero ("Botero") served as the Company's Chief Operating Officer ("COO") during the Class Period.

21.     Defendants Attard, Laitinen, Gordon, and Botero are collectively referred to herein as the "Individual Defendants."

22.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

23.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of

agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

25.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     PharmaCielo has one operating subsidiary, PharmaCielo Colombia, and describes its business as cultivating, processing and supplying all-natural medicine-grade cannabis oil extracts to large channel distributors via its greenhouse facilities in Colombia.

27.     Central to PharmaCielo's business is the company's "headquarters and principal cultivating facility" in Rionegro, Colombia which the company has touted at all relevant times on its website on a page called "Our Process," listing the many advantages of the 27-hectare Rionegro property, https://www.pharmacielo.com/our-process/.  Indeed, the Company referred to the purchase of the property as a "significant milestone," in a press release in July 2016.  The property consists of 12 hectares of open-air greenhouses and a processing & extraction facility.

28.     PharmaCielo's only other property in Colombia is a 3.6-hectare property in Northeastern Cauca.  When it purchased the Cauca land in 2017, the Company represented that it was building greenhouse facilities on the property. However, throughout the Class Period, and to date, the site remains empty.

29.     In other words, while PharmaCielo has represented on its website at all relevant times that that its *main* growing and processing operations are located at its facility in Rionegro, Colombia, in reality, the Rionegro operation is the *only* growing and processing operation producing revenue for the Company.

30.     Given that the Company has been burning cash at a rate of approximately $7 million a quarter, and that prior to 2019, earned no revenue at all from its cannabis products, it depended on the productivity and success of its Rionegro operation.  To assure investors regarding its prospects for revenue generation and growth, Defendants boasted of its capacity expansion and the construction of a research technology and processing center, which they began touting prior to the Class Period and promised to complete in 2019.

31.     However, unbeknownst investors, not only did the construction of the research technology and processing center face significant undisclosed delays, the Rionegro property has always faced two additional significant obstacles.  First, the property suffers from a mold issue caused by the flower-growing operation that preceded PharmaCielo's assumption of the Rionegro facilities.  Specifically, as a result of the prior

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS   Case No: 2:20-cv-02182-PSG-JC

flower-growing operation (daisy poms in particular), the cannabis crop at the Rionegro facility suffers from fugus botrytis, otherwise known as gray mold. The only way to treat gray mold is using harsh chemical fungicides, which can impact the ultimate quality and quantity of production.

32.     Second, the property is at risk of flooding due to an adjacent stream. Indeed, according to an officer at the Rionegro planning department, about one-third of the 27-hectare facility cannot be used for building or agriculture because it is on a flood plain and subject to strict environmental controls.

33.     Defendants did not reveal any of the issues with the Rionegro property during the Class Period nor did they reveal that the Company's only other property in Colombia, located in Cauca, remains empty and idle.

### **Related Party Transaction with General Extract**

34.     Up until the third quarter of 2019, PharmaCielo had not earned any revenue and burned vast sums of cash per quarter. Then, in September 2019, the Company announced a $3 million sales agreement with General Extract. Defendants did not disclose, however, that General Extract's registered agent is PharmaCielo's former COO, John Knapp. Moreover, two PharmaCielo directors are significant shareholders in General Extract's parent company, as is one of PharmaCielo's co-founders' son.

35.     Companies trading on the OTCQX, like PharmaCielo, are required to adhere to Generally Accepted Accounting Principles ("GAAP"), which includes the Statement of Financial Accounting Standards ("SFAS").

36.     SFAS 57 requires companies to report related-party transactions on their financial statements.   According to SFAS 57, a "related party" is one that "can significantly influence the management or operating policies of the transacting parties" or that "has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests."

37.     SFAS 57 provides that when a company engages in "material related party transactions," it "shall" disclose in its financial statements the following:

a. The nature of the relationship(s) involved

b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements

c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period [and]

d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

38.    Each of PharmaCielo's financial statements, purported to identify the Company's only related party transactions.  However, at no point during the Class Period did Defendants reveal the related party nature of the $3 million agreement with General Extract.

### PharmaCielo's Sham Transaction with XPhyto

39.    Not only did Defendants engage in a material transaction with a related party, without disclosing that relationship to investors, the Company also announced a three year distribution agreement with XPhyto in January 2020 purportedly to supply medicinal-quality cannabis extract oils and isolates to XPhyto for analysis, further processing, product development and manufacturing, and thereafter for sale into the German market, without disclosing that the arrangement is a sham.

40.    At the bottom of the press release, in a section entitled, "Additional Information," Defendants stated that as a term of the Agreement, PharmaCielo would invest $500,000 in XPhyto in return for unsecured convertible debentures.

41.    What Defendants failed to reveal however, was that XPhyto is run by a CEO with a history of running companies into the ground and in the months leading up to the agreement with PharmaCielo, XPhyto stood on the brink of insolvency.  Indeed, in the nine-month    period    prior    to    announcing    the    distribution    agreement,

XPhyto reported revenue of $45,000, operating losses of $5,351,789, and cash of only $791,030. In other words, XPhyto needed the $500,000 from PharmaCielo in order to fulfill its obligations under the agreement, effectively roundtripping the money back to PharmaCielo.

## Materially False and Misleading
## Statements Issued During the Class Period

42.    On June 21, 2019, PharmaCielo issued a press release announcing the Company's recent position in the stock market and announcing that the Company was "now trading on the OTC Markets under the symbol 'PHCEF.'"  The press release, as well as every other press release and Management's Discussion and Analysis ("MD&A") issued with the Company's quarterly and annual financial statements during the Class Period, directed investors to the Company's website for additional information.  The website has a "for investors" section that has the Company's press releases, financial statements, and Management's Discussion and Analysis reports dating back to 2018.

43.    PharmaCielo has represented at all relevant times on its website that its main growing and processing operations are located at its facility in Rionegro, Colombia. PharmaCielo Colombia owns 2 properties-- 12 hectares of open-air greenhouses and a processing & extraction facility situated on a 27-hectare property in Rionegro, and a 3.6-hectare property in Northeastern Cauca.   A page on the Company's website called "Our Process," lists the many advantages of the 27-hectare Rionegro property, https://www.pharmacielo.com/our-process/.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS  Case No: 2:20-cv-02182-PSG-JC

44.    The foregoing statements on PharmaCielo's website were false, misleading, and failed to disclose that: (i) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; (ii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle and, as such, Rionegro is not PharmaCielo's *main* growing and processing operation—it's the Company's *only* growing and processing operation; and (iii) the Company faced significant delays in the construction of its Research Technology and Processing Centre, which it had begun touting prior to the Class Period (and continued to tout during the Class Period).

45.    On July 25, 2019, PharmaCielo issued a press release announcing that it "completed the necessary permitting process required to enable Colombia's first commercial export and sale of non-psychoactive (CBD) isolate." In the press release, Defendant Botero stated, in relevant part:

> We have already begun scaling up our Colombian operations and we are ready to deliver and prepared to support the expected growth in demand for our cannabinoid extracts, having achieved the Colombian industry's first go-ahead to start exporting.

46.    The foregoing statements were false, misleading, and failed to disclose numerous obstacles to "scaling up our Colombian operations" including that: (i) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; (ii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and

remains idle and, as such, Rionegro is not PharmaCielo's *main* growing and processing operation—it's the Company's *only* growing and processing operation; and (iii) the Company faced significant delays in the construction of its Research Technology and Processing Centre, which it had begun touting prior to the Class Period (and continued to tout during the Class Period).

47.    On August 1, 2019, PharmaCielo issued a press release, announcing that:

> PharmaCielo…is ramping up its oil processing capabilities in the Company's Rionegro, Colombia facility following the recent acquisition and installation of additional high-performance, high-volume extractors, combined with proprietary extraction techniques.

> ***

> The Company also continues to expand the land area under active cultivation, currently at 12.1 hectares (capable in annual cultivation in excess of 0.48 million kg) from 5.3 hectares at the beginning of the year, with additional cultivation expansion expected to continue throughout the balance of the year.

48.    In touting the "oil processing capabilities" on its Rionegro property, Defendants misrepresented and failed to disclose that: (i) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; (ii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle and, as such, Rionegro is not PharmaCielo's *main* growing and processing operation—it's the Company's *only* growing and processing operation; and (iii) the Company faced significant delays in the

construction of its Research Technology and Processing Centre, which it had begun touting prior to the Class Period (and continued to tout during the Class Period).

49.    On August 27, 2019, PharmaCielo issued a press release which announced the Company's second quarter 2019 financial results and touted its "maturing" oil producing capabilities, and that, "Construction of Colombian processing facility nearing completion, capable of processing 265 tonnes of dried flower per year," further stating in pertinent part:

> The first six months of 2019 have been incredibly productive for PharmaCielo, as **the tea m in Colombia nears completion of the key foundational elements that will enable the Company to support the sale and export of processed oil**," said David Attard, Chief Executive Officer of PharmaCielo Ltd. . . . "Over the past several months PharmaCielo has been transitioning from our founding stage as we finalize the operational infrastructure and **are now entering into a more mature operational phase with inventory, finished products (oils and isolate), distributi on channels, sales agreements and, most recently, our announcements of international sales relationships and successful export.**

(Emphasis added.)

50.    In its financial statements issued the same day, Defendants stated, that "[t]he construction of the Research Technology and Processing Centre is progressing with the anticipated completion of construction in late 2019."

51.    On August 27, 2019, PharmaCielo also issued its "Management's Discussion and Analysis For the Three and Six Months Ended June 30, 2019" (the "August Management's Discussion and Analysis").  Therein, PharmaCielo described its expanding production capabilities, particularly with regards to oil production, stating the following,

in pertinent part, about its operations and facilities:

> Additional processing equipment now in place complements technologies previously installed and will immediately increase annual dried flower processing capacity in support of previously announced strategies for the expansion of hectares under cultivation, with a corresponding increase in finished oil production.

*    *    *

> ***The Company continues to expand the land area under active cultivation, currently at 12.1 hectares (capable in annual cultivation in excess of 0.48 million kg) from 5.3 hectares at the beginning of the year, with additional cultivation expansion expected to continue throughout the balance of the year.***

*    *    *

> PharmaCielo's nursery and propagation center, located in the municipality of Rionegro in the department of Antioquia, consists of 12 hectares of open-air greenhouses situated on a 27 hectare property, along with a manmade lake (natural water reservoir), ample cold storage, and industrial "plugging" systems customized to handle large-scale cutting operations. Each hectare of greenhouse contains 180 planting beds, each bed is 40.5 sq. meters (1.35 m x 30 m). The total bedding area per hectare is 7,290 sq. meters and the entire nursery and propagation center contains approximately 1.3 million square feet of planting beds. This nursery and propagation center is capable of producing on a weekly basis, significantly more than 12 million cuttings (e.g., clones) that would be required to supply 600 hectares of contract cultivation.

> ***PharmaCielo is also currently constructing a research technology and processing center ("Research Technology and Processing Centre"), with the anticipated completion of construction in late 2019.*** Once complete, the Colombian National Food and Drug Surveillance Institute ("INVIMA") must certify the center to ensure that it meets Colombian good and manufacturing standards. The Research Technology and Processing Centre will contain facilities to: (i) dry flowers naturally and by using drying machines; (ii) a milling area; (iii) extraction areas; and (iv) an area designed for testing for levels of THC and CBD levels in cannabis as well as for general compliance. ***To date, the Research Technology and Processing Centre costs have been***

17

***USD\$9 million and management projectsthat the completion of facility will require an additional USD\$6 million.***

(Emphasis added.)

52.    The foregoing statements issued on August 27, 2019 were false, misleading, and failed to disclose that: (i) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; (ii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle and, as such, Rionegro is not PharmaCielo's *main* growing and processing operation—it's the Company's *only* growing and processing operation; and (iii) the Company faced significant delays in the construction of its Research Technology and Processing Centre, which it had begun touting prior to the Class Period (and continued to tout during the Class Period).

53.    On September 25, 2019, PharmaCielo issued a press release, "PharmaCielo Enters the U.S. with \$3 Million Q4 Sales Agreement and Completes Introductory Shipments to Multi-state Distributor General Extract LLC."  Hyping the agreement, Defendants stated in the press release that:

> …it has signed a United States sales agreement (the "Agreement") with an established multi-state distributor, General Extract LLC ("General Extract"). According to the non-exclusive Agreement, PharmaCielo will provide the distributor with bulk medicinal CBD isolate meeting the purity requirements of the 2018 USA Farm Bill, for sale in multiple states including California and Colorado.  The Agreement addresses the balance of 2019 and allows for both renewal and volume expansion in 2020 based on market demand.

PharmaCielo has already successfully concluded initial shipments to the distributor in verification of shipping routes and international trade and customs requirements, with contracted shipping volumes planned for the balance of the year as per the Agreement. Introductory revenues under the contract provide 2019 revenue of $3 million CDN, with allowance for increased volumes within the period under the Agreement based on market demand, and expansion on agreement renewal for subsequent periods.

The Agreement marks PharmaCielo's initial foray into the coveted United States market as a supplier of medicinal-grade CBD isolate, allowing the Company to expand its offerings in the near future with additional CBD products consistent with the 2018 Farm Bill.

Defendant Attard is quoted in the press release as stating:

To say we are excited about this milestone is an understatement. Our business strategy is focused on large-volume, large-market relationships, and we are fully equipped to process in excess of 265 metric tonnes of dried flower into isolates and extracts to meet the high demand, with continued processing capacity expansion under way.

54.    Further, that same day, in a Q&A with *Hemp Industry Daily* that appeared on PharmaCielo's website, Defendant Gordon touted the agreement with General Extract, stating, *inter alia*:

It gives us a competitive edge and a strong foothold in the world's largest medical CBD market. I also consider it an important development for the Colombian CBD industry at large as it helps to build recognition for the industry on a global scale.

Defendant Gordon also emphasized the importance of extending its processing capacity, *i.e.,* completing its extraction and processing center:

So, in 2019 we have begun commercial sales, and in 2020 and 2021 we plan to continue and expand significantly. To support this, PharmaCielo is at the final stages of building an extended processing capacity to meet global demand.

19

55.    The foregoing statements Defendants issued on September 25, 2019 were false, misleading, and failed to disclose that the agreement with purported multi-state distributor General Extract—a company with no apparent credible operations: (i) qualified as a related party transaction with PharmaCielo's former Chief Operations Officer; (ii) two large shareholders in General Extract's parent company, Carlos Manuel Uribe (Lalinde) and Andres (Fernandez) Acosta, are directors at PharmaCielo; and (iii) one large shareholder in General Extract's parent company, Miguel Cock-Gomez, is the son of PharmaCielo co-founder Federico Cock-Correa.    Moreover, in touting its "capacity expansion," Defendants misrepresented and failed to disclose that: (i) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; (ii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle and, as such, Rionegro is not PharmaCielo's *main* growing and processing operation—it's the Company's *only* growing and processing operation; and (iii) the Company faced significant delays in the construction of its Research Technology and Processing Centre, which it had begun touting prior to the Class Period (and continued to tout during the Class Period).

56.    With no prior revenues and a continued cash burn rate of $7 million a quarter, the market paid particular heed to the announcement of the General Extract agreement. For example, GMP Securities analyst Robert Fagan issued a flash report that same day,

reiterating a buy rating, and calling the agreement with General Extract, "a definite milestone for the company."

57.    On November 25, 2019, PharmaCielo issued a press release which announced the Company's third quarter 2019 financial results (the "3Q 2019 Financial Results") and touted its expansion, the construction of the processing center, as well as its $3 million agreement with General Extract, stating in pertinent part:

> *Initiating commercial sales – Completed sales negotiation in Q3-2019 to ship a minimum of $3 million worth of bulk CBD isolate to a distributor in the U.S. during Q4-2019.*

*    *    *

> *Nearing completion of extraction and processing center* ("RTC"), which will expand the Company's extraction capacity to 265 tonnes of dried flower per year (processed equivalent volume of 28,900 kg of cannabis oil per year).

Moreover, Defendant Attard is quoted as stating:

> Our focus in Q4 and through 2020 will be on a continued ramp up of our processing facilities and on generating revenue at commercial scale both through the expansion of global sales relationships, and the signing of commercial supply agreements in jurisdictions where we are present today.

58.    Also, on November 25, 2019, PharmaCielo issued its "Condensed Interim Consolidated Financial Statements Three and Six Months Ended September 30, 2019" (the "November Financial Statements").

59.    In the November Financial Statements, PharmaCielo touted its expanding production capabilities, particularly with regards to oil production, stating the following, in pertinent part, about its operations and facilities:

PharmaCielo Colombia Holdings S.A.S. is developing a farm and a processing plant, located in Rio Negro the municipality of La Cieja (Antioquia), for the purpose of cultivating and sowing, as well as assembly of the cannabis oil. The farm includes greenhouses, offices and agricultural areas. As of September 30, 2019, the construction and assets in transit balance of $6,601,714 (December 31, 2018 - $3,066,880) represents the developing activities that have not yet been completed.

\*        \*        \*

The Company has an agreement with CNV Construcciones S.A.S. ("CNV"), a Colombian construction company, to pay CNV USD$32,314 to complete the construction of the Research Technology and Processing Centre in 2019. ***The construction of the   Research Tech nology and Processi ng Centre is progressing with  the anticipated completion of  construction in late 2019.*** Once completed, the Research Technology and Processing Centre must be certified by INVIMA in order to ensure that it meets Good Manufacturing Practice (GMP) standards.

(Emphasis added.)

60.    In the November Financial Statements, PharmaCielo purportedly listed all of its related party transactions but did not include the transaction with General Extract.

61.    The foregoing statements Defendants issued on November 25, 2019 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the agreement with purported multi-state distributor General Extract—a company with no apparent credible operations, qualified as a related party transaction with PharmaCielo's former Chief Operations Officer;  two large shareholders in General Extract's parent company, Carlos

Manuel Uribe (Lalinde) and Andres (Fernandez) Acosta, are directors at PharmaCielo; and one large shareholder in General Extract's parent company, Miguel Cock-Gomez, is the son of PharmaCielo co-founder Federico Cock-Correa; (ii) PharmaCielo had significantly overstated the efficacy and competitiveness of the Company's business and operations in South America, including Peru and Columbia; (iii) it faced significant delays in the construction of PharmaCielo's Research Technology and Processing Centre; (iv) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; and (v) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle.

62.    On December 14, 2019, PharmaCielo issued a press release announcing that it had received an MJBiz Daily Game Changer Award, which Defendant Attard attributed to, "PharmaCielo's role and contribution in paving the way and building the medical cannabis industry in Latin America."  Defendant Attard further stated that, "Now that we have laid the groundwork we are looking forward to a strong 2020 and expanding our ***existing presence thro ughout Latin America*** which began with Mexico, and which in 2019 added a number of others including both Uruguay and Argentina." Emphasis added.

63.    The foregoing statements were materially false and/or misleading because they misrepresented and failed to disclose that PharmaCielo could not expand its Latin

American business into Peru because the Company failed to comply with the requirements

of a bidding process to supply medical cannabis in Peru.

## THE TRUTH BEGINS TO EMERGE

64.    On January 9, 2020, *Marijuana Business Daily* ("*MBD*") published an article

entitled "New medical cannabis sales opportunities in Peru face downward price pressure

after winning company's very low bid" (the "*MBD* Article").  According to that article,

"[t]he price offered by the winner of the first bidding process to supply medical cannabis

in Peru came in well below that of other applicants," including PharmaCielo, which, "[t]o

comply with the purity requirement . . . offered CBD isolate in powder form," and was

disqualified "because the company didn't make an offer in 'liquid' form as required."

65.    On this news, shares of PharmaCielo fell $0.122 per share, or 4.80%, to close

at $2.42 per share on January 10, 2020.  However, PharmaCielo's shares continued to

trade at artificially inflated prices as a result of Defendants' continued misrepresentations

and misstatements throughout the rest of the Class Period.

66.    Indeed, a week after the *MBD* article, on January 17, 2019, PharmaCielo

issued a press release continuing to tout the General Extract agreement, and announcing

that, "PharmaCielo Receives Acceptance from TSX Venture Exchange of Supply

Agreement for Export of 2018 Farm Bill Compliant CBD Isolate to United States."  The

Company explained that "[t]he TSXV has approved the exportation of up to $3,000,000 of

medicinal-grade CBD isolate under the Supply Agreement" with General Extract, and

claimed to have already, "successfully completed a series of introductory commercial shipments to the distributor in verification of shipping routes and international trade and customs requirements." In the press release, Defendant Attard is quoted as stating, in relevant part:

> We believe we are the first TSXV listed company to receive approval to export CBD isolate from Colombia to the US market and we plan to leverage this first mover advantage to continue expanding our relationships in the US, introducing additional products allowed under the 2018 Farm Bill and driving results for shareholders.
>
> Due to the approval timeline, we were unable to meet the US market delivery and revenue schedule originally announced for 2019. That said, we expect to have commercial deliveries into the US market reflected in the current quarter and are actively looking to expand in that market, positioning the Company well for 2020.
>
> With the continued expansion of the US market and the individual states participating in the medicinal sector, PharmaCielo's industry-leading production cost structure, superior quality of our extracts and the scale at our disposal, position the Company to capture market share and drive results in 2020 and beyond.

67.    The foregoing statements were false, misleading, and failed to disclose that its recent agreement with purported multi-state distributor General Extract—a company with no apparent credible operations: (i) qualified as a related party transaction with PharmaCielo's former Chief Operations Officer; (ii) two large shareholders in General Extract's parent company, Carlos Manuel Uribe (Lalinde) and Andres (Fernandez) Acosta, are directors at PharmaCielo; and (iii) one large shareholder in General Extract's parent company, Miguel Cock-Gomez, is the son of PharmaCielo co-founder Federico

Cock-Correa.  Moreover, in touting the "scale at our disposal" as a key to its expansion in the US market, Defendants misrepresented and failed to disclose that (i) PharmaCielo's Research Technology and Processing Centre was never on-schedule and is delayed; (ii) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; and (iii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle.

68.    Then, one week later, on January 24, 2019, Defendants issued a press release announcing a three-year performance-based distribution agreement with CBD Export Global.   In the press release, Defendant Attard stated, in part:

> The agreement with CBD Export Global is part of PharmaCielo's second-phase growth strategy complementing the first phase ***in which we established one of the largest cultivation and   extraction operations in  Colombia*** and initiated global sales, and now in the second phase ***expanding the distribution network*** as production volumes increase on a daily basis to take our high-quality medicinal CBD extracts to global markets.

69.    The foregoing statements were false, misleading, and failed to disclose the following with regard to PharmaCielo's "cultivation and extraction operations in Colombia": (i) PharmaCielo's Research Technology and Processing Centre was never on-schedule and is delayed; (ii) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; and (iii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle.  With regarding to "expanding the

distribution network," Defendants misrepresented and failed to disclose that its recent agreement with purported multi-state distributor General Extract—a company with no apparent credible operations: (i) qualified as a related party transaction with PharmaCielo's former Chief Operations Officer; (ii) two large shareholders in General Extract's parent company, Carlos Manuel Uribe (Lalinde) and Andres (Fernandez) Acosta, are directors at PharmaCielo; and (iii) one large shareholder in General Extract's parent company, Miguel Cock-Gomez, is the son of PharmaCielo co-founder Federico Cock-Correa.

70.    Then, a few days later, the Company announced that it struck a three-year supply and distribution deal to serve XPhyto Therapeutics Corp.'s German medical cannabis business.  Specifically, on January 27, 2020, PharmaCielo issued a press release which announced:

> . . . that it has entered into a three-year agreement (the "Agreement") with **XPhyto Therapeutics Corp.** ("**XPhyto**") (**CSE:XPHY; FSE:4XT**), whereby PharmaCielo will supply medicinal-quality cannabis extract oils and isolates, including those containing THC, to XPhyto for analysis, further processing, product development and manufacturing at its European Union Good Manufacturing Practice certified ("EU GMP") facility in Biberach in the state of Baden-Württemberg, and thereafter for sale into the German market.
>
> *        *        *
>
> Pursuant to the Agreement, XPhyto granted PharmaCielo 500,000 Common Share purchase Warrants ("Warrants") with an exercise price of $2.00 per Common Share.

As a term of the Agreement, PharmaCielo will enter into an agreement (the "Purchase Agreement") to purchase CAD $500,000 of unsecured convertible debentures of XPhyto (the "Debentures"), to fund expansion of its processing capabilities. The Debentures mature two years from the date of issue and bear interest of 8.0% per annum. The Debentures will be convertible by PharmaCielo into 500,000 common shares of XPhyto subject to certain XPhyto acceleration rights. The purchase of the Debentures is subject to approval by the Canadian Securities Exchange (the "CSE"). XPhyto will also grant PharmaCielo 500,000 Warrants with an exercise price of $1.50 per Common Share.

71.    Defendant Attard pitched the partnership as, "…a significant opportunity to export an ever-expanding range of medicinal products into the German market, including those containing THC…"  Defendant Attard further characterized the agreement as an opportunity to ramp up sales significantly, stating, "We expect to generate meaningful revenue through this agreement over the next three years and are focused on continuing the ramp-up of our sales efforts through 2020."

72.    In an interview with Benzinga on September 28, 2019, Defendant Attard lauded the Company's recent distribution and sales agreements as "significant milestones":

The distribution and sales agreements we just secured are significant milestones in PharmaCielo's growth [as they] turn a page in our business strategy from a large-scale Colombian cultivator and processor into a global supplier of high-grade medicinal CBD and THC extracts.

The collaboration with XPhyto and CBD Export Global will provide a critical mass and presence of our high-grade cannabis extracts across Europe for medicinal, therapeutic and wellness purposes.

73.    Defendants' statements assured the market regarding PharmaCielo's prospects.    For example, Stifel Canada analyst Robert Fagan reiterated a "buy" recommendation on the Company's securities.    Citing both the General Extract and XPhyto agreements, Fagan wrote in an update to investors:

> With two supply agreements signed recently, PCLO is making solid progress on distribution in our view. This has increased visibility on our forecasts with first year volumes potentially representing sales of ~US$10–15 million, or ~20–30 per cent of our calendar 2020 revenue estimate. We note PCLO has now made solid in-roads into both the US and EU markets, helping to de-risk its outlook

74.    In an interview with Cannabis Business Times on February 13, 2020, Defendant Gordon touted the advantages of PharmaCielo's location in Rionegro as compared to other locations:

> Our producing costs per gram of dry flower are US$0.04. In Canada, the cheapest that anyone has declared is US$0.95. That is dramatically different. Our outdoor cultivation process in Rionegro [Antioquia] receives 12 hours of light and 12 hours of dark. It is the perfect location and the perfect temperature.

75.    The foregoing statements in ¶¶ 70-72, 74 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the agreement with purported multi-state distributor General Extract—a company with no apparent credible operations--- qualified as a related party transaction with PharmaCielo's former Chief

Operations Officer;  two large shareholders in General Extract's parent company, Carlos Manuel Uribe (Lalinde) and Andres (Fernandez) Acosta, are directors at PharmaCielo; and one large shareholder in General Extract's parent company, Miguel Cock-Gomez, is the son of PharmaCielo co-founder Federico Cock-Correa; (ii) PharmaCielo had significantly overstated the efficacy and competitiveness of the Company's business and operations in South America, including Peru and Columbia; and (iii)  PharmaCielo had entered into a misleading transaction with XPhyto, a nearly insolvent company run by a CEO with a history of running companies into the ground, pursuant to which PharmaCielo provided XPhyto with  money it could roundtrip back to the Company to buy product. Moreover, in touting its operations and efforts to expand, Defendants misrepresented and failed to disclose that (i) PharmaCielo faced significant delays in the construction of its Research Technology and Processing Centre; (ii) the Rionegro facility is located on a floodplain and is contaminated with mold and pesticides from its previous tenants; and (iii) PharmaCielo's Cauca Department land, its only other property in Colombia aside from Rionegro, has never been utilized by the Company and remains idle.

## **THE TRUTH FULLY EMERGES**

76.    On March 2, 2020, Hindenburg Research published a report (the "Report") explaining that PharmaCielo had failed to disclose: (i) transactions with related parties; (ii) misleading business transactions and loans with General Extract and XPhyto; (iii) the

30

delayed state of its Research Technology and Processing Centre's construction; and (iv) the poor state of its Rionegro Growing Facility.

77.    The Report noted the following, in pertinent part, regarding PharmaCielo's undisclosed related party transactions:

> PharmaCielo recently announced a U.S. distribution deal with an opaque company called General Extract LLC. **We found that this is    yet another undisclosed related party deal, involving PharmaCielo's former COO.**
>
> *          *          *
>
> The company's U.S. distribution partner is actually yet another undisclosed related-party deal with a company that appears to have limited to no credible operations.
>
> *          *          *
>
> **Undisclosed Related-Party Deals: PharmaCielo's New U.S. Distribution Deal with General Extract LLC Is Yet Another Questionable Deal with A Former PharmaCielo COO**
>
> *          *          *
>
> **But what the company did not disclose seems far more important: General Extract appears to be a related party entity with no credible operations run by PharmaCielo's former Chief Operating Officer.**
>
> The articles of incorporation [] for General Extract, LLC show "John Knapp" as the company's registered agent. Mr. Knapp was former "Chief Operations Officer" of PharmaCielo, per this 2016 regulatory filing [] with British Columbia Securities Regulators.
>
> *          *          *
>
> **All told, nearly all of the key peopleat PharmaCielo's new U.S. distribution partner General Extract (and its    parent Redwood Green) appear to be related to PharmaCielo.**

31

(Emphasis added.)

78.    The Report noted the following, in pertinent part, regarding PharmaCielo's transactions with General Extract:

**General Extract, Which PharmaCielo Described as an "Established Multi State Distributor" Appears to Have No Products and No Credible Operations Whatsoever**

Most "established" companies at least have a website.

When we examined General Extract, we found that its website [] domain was registered on November 14, 2019, about 3 weeks after entering into its sales agreement with PharmaCielo.

Along the same lines, the email address used by General Extract in its press [] with PharmaCielo was a Gmail address [] (presumably because they didn't even have a domain registered at the time)[.]

                    *    *    *

Despite the claim by PharmaCielo that General Extract is a "multistate" [] distributor, we were unable to find evidence to confirm this. Nothing on General Extract's website as of 3/1/2020 [] says anything about multi-state distribution, multiple locations, or suggests any clients exist other than PharmaCielo.

**We Visited General Extract in Colorado And We Found Its "Offices" Bore the Logo of a Different Company. Its Parent Company's Office "Suite" Was Actually A Mailbox at A UPS Store**

Our investigator, did, however, see people leaving various parts of the building around 4:50pm local time; some of whom were wearing grey sweaters with a logo that resembled a "Good Meds" logo. "Good Meds" is the other brand owned by Redwood Green and operated by John Knapp [], the individual listed on General Extract's corporate documents [].

                    *    *    *

Instead, it appears that General Extract exists largely on paper.

32

**Undisclosed Related-Party Deals: General Extract's Parent Corporation, Redwood Green, Is Also Replete with Related Party Ties to PharmaCielo**

General Extract's parent company, Redwood Green [] also consists of multiple people tied closely to PharmaCielo.

\* \* \*

All told, nearly all of the key people at PharmaCielo's new U.S. distribution partner General Extract (and its parent Redwood Green) appear to be related to PharmaCielo. Most importantly, none of this was disclosed to investors when the company touted its "milestone" distribution deal.

(Emphasis added.)

79.    In addition to describing XPhyto's CEO's sordid history of running companies into the ground, the Report noted the following, in pertinent part, regarding PharmaCielo's transactions with XPhyto Therapeutics:

PharmaCielo's other main partnership, a distribution deal with nanocap company XPhyto, appears to be little more than a shell game. ***PharmaCielo is supplying XPhyto with cash so XPhyto can      turn around and buy PharmaCielo's products.***

\* \* \*

**Another Sketchy "Partnership": PharmaCielo Is Paying a Company Called XPhyto To Buy PharmaCielo's Product with PharmaCielo's Money**

\* \* \*

XPhyto's financials show that the company was in apparent distress leading up to the deal. In the 9-month period prior to announcing the deal, XPhyto reported [] revenue of $45,000, operating losses of $5,351,789, and cash of only $791,030. In other words, they look to have been at the brink of insolvency.

*　　*　　*

When it boils down to it, this partnership appears to us to be a sham. PharmaCielo is paying a distressed company to "buy" its product. Aside from the splashy headline, the "deal" appears to offer no economic advantage.

***In a best-case scenario, we think PharmaCielo will get its own money back and have to hand over valuable product.*** So far, we haven't seen any purchases by XPhyto as the partnership announcement [] was recent, on January 27, 2020.

Realistically, given the state of XPhyto's current balance sheet and its dwindling cash, we expect PharmaCielo will simply lose most of its investment in XPhyto with little to show for it.

(Emphasis added.)

80.     The Report noted the following, in pertinent part, regarding PharmaCielo's Rionegro greenhouse facilities:

According to local sources, the Rionegro greenhouse facilities have issues with mold and residual pesticides from the flower-growing operation that preceded the company's use of the facility.

*　　*　　*

***The company's main facility in Rionegro may be troubled with mold and pesticide contamination, likely or     iginating from the flower-growing operation that preceded Ph     armaCielo's assumption of the facilities***, according to local sources we spoke with. ***In addition, Rionegro planni ng authorities say one-third of the land     is unusable due to environmental restrictions and the risk of flooding.***

*　　*　　*

**Financials and Operations: Reported Issues with Mold and Heavy Pesticides in the Company's Rionegro Facility**

34

Additionally, a source that our investigator spoke with, a businessperson who is part of the flower-growing industry, said *based on their recent knowledge and entry to the PharmaCielo facility, they believed the cannabis crop there was "suffering from a bad outbreak of the fungus botrytis (or gray mold.)"*

They said the fungus was a major problem with certain flower cultivations, especially daisy poms (pompoms) – which is the type of flower that our investigator was told was being cultivated on the property prior to PharmaCielo taking it over.

\*    \*    \*

The other salient land issue is the flood risk from an adjacent stream. *An officer at the Rionegro planning department explained about one-third of the 27 hectare facility could not be used for building or agriculture because it was on a flood plain and subject to strict environmental controls.*

(Emphasis added.)

81.    The Report noted the following, in pertinent part, regarding construction on PharmaCielo's Rionegro Research Technology and Processing Centre:

The company's Rionegro cannabis oil processing centre [the Research Technology and Processing Centre], a key element of its plan to export oils, remains unfinished after almost 6 months of delays.

\*    \*    \*

**Financials and Operations: Cap-Ex Needs and the Company's Delayed Oil Processing Centre**

\*    \*    \*

*We also see from the same filing that despite the company claiming the oil processing centre was "nearing completion" in August 2019, by September it estimated that over U.S. $7 million in anticipated capital expenditures would be needed in order to complete the project.*

The company has not yet announced whether the facility is completed. ***We contacted investor relations and asked about it's status and have not yet received a reply.*** The facility does appear to be under construction, according to pictures posted by a development group [] associated with the project[.]

The photos [] were posted around June 2019***. Based on the timing, we anticipate that the external elements of the building are completed or close to being completed. We attempted to visit the facility to examine its progress but were unable to.***

In either case, investors should factor in the additional estimated $7 million cash burn from the cap-ex required to complete the facility. We also think the company should provide investors with an update on progress, with pictures.

(Emphasis added.)

82.    The Report noted the following, in pertinent part, regarding PharmaCielo's

land in the Cauca Department of Colombia:

The company announced it was building greenhouse facilities on newly purchased land in Colombia's Cauca region in 2017. ***We visited the land and found the greenhouses don't exist.*** The site is nothing more than an empty field covered in weeds. (We have photos and video)

\*    \*    \*

***The company's key 3.6 hectare 'operation' in Colombia's Cauca region is actually just an empty field*** (we have pictures and video). We confirmed this with local leaders of a farming co-op that struck a deal to grow cannabis with the company.

\*    \*    \*

**"There's Nothing There, Just Weeds": PharmaCielo's 'Greenhouse Facility' in Cauca Doesn't Exist**

Our investigator visited the Cauca property in February 2020, led by a senior member of the cooperative. He saw that PharmaCielo's greenhouse facility in Cauca, first touted 2 years ago, simply doesn't exist.

36

\*        \*        \*

**Since the cultivation license was issued in November 2017, the person said there has been no further investment, no greenhouse has been built and not a single cannabis plant has been sown.**

(Emphasis added.)

83.    On this news, shares of PharmaCielo fell $0.5132 per share over the next two trading days, or 36.14%, to close at $0.9068 per share on March 3, 2020, damaging investors.

84.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

85.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired PharmaCielo securities publicly traded on the OTCQX during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of PharmaCielo, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

86.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, PharmaCielo securities were actively traded

on the OTCQX.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

87.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

88.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

89.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of PharmaCielo;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

38

- whether the Defendants caused PharmaCielo to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of PharmaCielo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

90.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

91.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- PharmaCielo shares met the requirements for listing, and were listed and actively traded on the OTCQX, an efficient market;

- As a public issuer, PharmaCielo filed periodic public reports;

- PharmaCielo regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- PharmaCielo's securities were liquid and traded with sufficient volume during the Class Period; and

- PharmaCielo was followed by several securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

92.    Based on the foregoing, the market for PharmaCielo securities promptly digested current information regarding PharmaCielo from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

93.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

94.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

96.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

• employed devices, schemes and artifices to defraud;

• made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

• engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of PharmaCielo securities during the Class Period.

41

98.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PharmaCielo were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of PharmaCielo, their control over, and/or receipt and/or modification of PharmaCielo's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PharmaCielo, participated in the fraudulent scheme alleged herein.

99.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PharmaCielo personnel to members of the investing public, including Plaintiff and the Class.

100.    As a result of the foregoing, the market price of PharmaCielo securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of PharmaCielo securities during the Class

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS   Case No: 2:20-cv-02182-PSG-JC

Period in purchasing PharmaCielo securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

101. Had Plaintiff and the other members of the Class been aware that the market price of PharmaCielo securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased PharmaCielo securities at the artificially inflated prices that they did, or at all.

102. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

103. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of PharmaCielo securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of The Exchange Act
### Against the Individual Defendants

104. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105. During the Class Period, the Individual Defendants participated in the operation and management of PharmaCielo, and conducted and participated, directly and indirectly, in the conduct of PharmaCielo's business affairs. Because of their senior

positions, they knew the adverse non-public information about PharmaCielo's misstatement of revenue and profit and false financial statements.

106.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PharmaCielo's financial condition and results of operations, and to correct promptly any public statements issued by PharmaCielo which had become materially false or misleading.

107.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PharmaCielo disseminated in the marketplace during the Class Period concerning PharmaCielo's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PharmaCielo to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of PharmaCielo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PharmaCielo securities.

108.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PharmaCielo.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of itself and the Class, pray for judgment and relief as follows:

A.    Declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as the class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

B.    Awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.    Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  August 21, 2020                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**POMERANTZ LLP**
Jeremy A. Lieberman
(admitted *pro hac vice*)
Tamar A. Weinrib
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
taweinrib@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(admitted *pro hac vice*)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

***Lead Counsel for Plaintiff***

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

***Additional Counsel for Howard Anderson***

**THE SCHALL FIRM**
Brian Schall
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 877-590-0482

brian@schallfirm.com

***Additional Counsel for Pamela Q***

47