**POMERANTZ LLP**
Jeremy A. Lieberman
(admitted *pro hac vice*)
Tamar A. Weinrib
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
taweinrib@pomlaw.com

*Attorneys for Plaintiff*

 - additional counsel on signature page -

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PHARMACIELO LTD. SECURITIES LITIGATION | Case Number: 2:20-cv-02182-PSG-JC |
| This Document Relates to: All Actions | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** <br> Date:     December 10, 2021 <br> Time:     1:30 p.m. <br> Court:    6A <br> Judge:    Hon. Philip S. Gutierrez |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

TABLE OF CONTENTS

Page(s)

I.    PRELIMINARY STATEMENT ...................................................................1

II.    STATEMENT OF FACTS ..........................................................................2

III.    ARGUMENT ..............................................................................................9

    A.    The SAC Adequately Pleads Actionable Misstatements .....................10

    B.    The SAC Adequately Pleads Scienter....................................................17

    C.    The SAC Adequately Pleads Reliance...................................................21

    D.    The SAC Adequately Pleads Loss Causation .......................................23

    E.    Section 10(b) Covers Plaintiff's Claim................................................24

IV.    CONCLUSION..........................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) ...............................................................................25

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972).........................................................................................22

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................11

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 U.S. Dist. LEXIS 141724 (N.D. Cal. Aug. 7, 2020) ...............................10

*Brown v. China Integrated Energy, Inc.*,
2012 U.S. Dist. LEXIS 196448 (C.D. Cal. June 12, 2012)...............................14

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010) ..............................................................24

*Constr. Workers Pension Tr. Fund v. Genoptix, Inc.*,
2013 U.S. Dist. LEXIS 49716 (S.D. Cal. Mar. 22, 2013).........................23, 24

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).........................................................................................23

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .........................................................................25

*Eng v. Edison Int'l*,
2017 U.S. Dist. LEXIS 69196 (S.D. Cal. May 5, 2017) ...................................23

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) .............................................................................11

*Giunta v. Dingman*,
893 F.3d 73 (2d Cir. 2018) ...............................................................................25

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015)..............................................................19

*In re Acadia Pharm. Inc. Sec. Litig.*,
  2020 U.S. Dist. LEXIS 95464 (S.D. Cal. June 1, 2020) ....................................11

*In re Amgen Inc. Sec. Litig.*,
  2014 U.S. Dist. LEXIS 183034 (C.D. Cal. Aug. 4, 2014) ................................17

*In re Amgen Inc. Sec. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..............................................................17

*In re Amgen Inc. Sec. Litig.*,
  No. CV 07–2536 PSG, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ......................................................................................................................23

*In re BofI Holding, Inc. Securities Litigation*,
  977 F.3d 781 (9th Cir. 2020) ..............................................................................24

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ............................................................................21

*In re Empyrean Bioscience, Inc. Sec. Litig.*,
  255 F. Supp. 2d 751 (N.D. Ohio 2003) ..............................................................22

*In re Gilead Scis. Sec Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................................10

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................21

*In re Iso Ray Inc. Sec. Litig.*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016) ..........................................................20

*In re Myriad Genetics, Inc.*,
  2021 WL 977770 (D. Utah Mar. 16, 2021) ........................................................19

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .......................................................................18, 19

*In re SolarCity Corp. Sec. Litig.*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) ................................................................20

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ..............................................................................11

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2019 U.S. Dist. LEXIS 166832 (N.D. Cal. Sept. 26, 2019)................................22

*In re WageWorks, Inc., Sec. Litig.*,
    2020 WL 2896547 (N.D. Cal. June 1, 2020).....................................................20

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .............................................................................9

*Longo v. Osi Sys.*,
    2021 U.S. Dist. LEXIS 63773 (C.D. Cal. Mar. 31, 2021)................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..............................................................................................9

*Maz Partners v. First Choice Healthcare Sols., Inc.*,
    2019 U.S. Dist. LEXIS 184611 (M.D. Fla. Oct. 16, 2019)...............4, 11, 21, 24

*Melcher v. Fried*,
    2018 U.S. Dist. LEXIS 205252 (S.D. Cal. Dec. 4, 2018) .................................15

*Merkamerica Inc. v. Glover*,
    2019 U.S. Dist. LEXIS 231519 (C.D. Cal. Dec. 3, 2019).................................12

*Morrison. Rubenstein v. Cosmos Holdings, Inc.*,
    2020 U.S. Dist. LEXIS 121773 (S.D.N.Y. July 10, 2020)................................25

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)................................................................................2, 24, 25

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
    890 F.3d 60 (2d Cir. 2018) ...............................................................................25

*N.M. State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) ..........................................................................21

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................10

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
    2017 U.S. Dist. LEXIS 122725 (C.D. Cal. Jan. 17, 2017)...............................13

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

*Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...............................................................20

*Ret. Tr. v. RH. Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018)..............................................................23

*Robb v. Fitbit, Inc.*,
    2017 WL 219673 (N.D. Cal. Jan. 19, 2017)......................................................19

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018)..............................................................12

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ..............................................................................10

*Scott v. ZST Dig. Networks, Inc.*,
    2012 U.S. Dist. LEXIS 19392 (C.D. Cal. Feb. 14, 2012) ..................................24

*SEC v. Ficeto*,
    839 F. Supp. 2d 1101 (C.D. Cal. 2011) ..............................................................25

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) ..........................................................14, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................10, 17

*United States v. Isaacson*,
    752 F.3d 1291 (11th Cir. 2014) ..........................................................................25

**Statutes**

15 U.S.C. §78j(b) ........................................................................................2, 10, 24

15 U.S.C. §78t(b) .......................................................................................................24

15 U.S.C. § 78u-4(b)(1) ............................................................................................10

**Rules**

Fed. R. Civ. P. 8(a)(2)................................................................................................23

Fed. R. Civ. P. 9(b) ...................................................................................................10

Rule 12(b)(6)................................................................................................................9

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

## I.    PRELIMINARY STATEMENT

The Second Amended Complaint for Violations of the Federal Securities Laws, filed on May 21, 2021 (ECF No. 50)("SAC") contains new allegations that cure each deficiency the Court noted in its April 16, 2021 order granting Defendants' motion to dismiss the amended complaint ("FAC") on falsity and scienter grounds (ECF No. 49) ("Order").  Specifically, the SAC newly alleges statements from six confidential witnesses ("CWs"), corroborating one another, with firsthand knowledge that the flooding and gray mold issues on the Rionegro property negatively impacted operations by reducing the amount and quality of production, and in the case of flooding, causing operations to cease altogether.  The CWs further describe known factors substantiating why Defendants never had a basis for specifying a 2019 completion date for the Centre.  The SAC also alleges how Defendants' statements regarding *current* Latin American expansion efforts misled investors given their *contemporaneous* failure in the potentially lucrative Peruvian bidding process and given the Company's meager revenues at the time.  Moreover, the SAC contains new allegations pleading the materiality of statements concerning the General Extract deal, the XPhyto deal (as well as further indicia that deal was a sham) and statements relevant to the idle Cauca property, *though materiality is a fact intensive inquiry that is not suited for adjudication at the pleading stage*.

The Court considered and only rejected scienter as to statements regarding the Centre and Latin American expansion. Order at 10.  Along with additional

1

compelling allegations of scienter, the SAC contains new allegations including statements from the six CWs, demonstrating that Defendants always knew of the significant factors that caused construction to restart multiple times and led to extensive expected delays.  The SAC also alleges that the Company only earned scant revenue from one other Latin American country aside from Colombia when they touted their *current* expansion efforts, and contemporaneously knew that they had not adhered to bidding requirements that stymied their *current* efforts in Peru.

In the Order, the Court noted *each* element of the §10(b) claim, considered *all* of the briefing on the motion to dismiss, and found no deficiency as to the remaining elements of the claim. *See* Order at 1, 4.  Nevertheless, Defendants argue that the Order does not consider any element other than falsity, and thus regurgitate verbatim prior arguments on loss causation, reliance, and *Morrison* (thrice claiming the Court does not address scienter though three pages of the eleven page Order discuss the issue, Order at 6, 8, and 10), all of which are addressed below and remain unavailing.

## II.    STATEMENT OF FACTS ("SOF")[1]

PharmaCielo has **one** operating subsidiary, PharmaCielo Colombia, which cultivates, processes and supplies all-natural medicine-grade cannabis oil extracts to distributors via its greenhouse facilities in Rionegro, Colombia. ¶ 26.  Defendants touted the many advantages of its Rionegro property, its "headquarters," on its

---

[1] All ¶ __ references are to the SAC.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

website. ¶ 27. PharmaCielo's only other property in is in Cauca. Despite stating in 2017 that it was building greenhouse facilities there, to date, the site is empty. ¶ 28. Thus, while Defendants stated that its *main* operation is in Rionegro, it is in fact its *only* operation. ¶ 29. Given that PharmaCielo burned around $7 million a quarter and earned no revenue prior to 2019, it depended on its Rionegro operation. ¶ 30.

### Undisclosed Research Technology and Processing Centre ("Centre") Delays

Defendants boasted of capacity expansion and the construction of a Centre, which they promised to complete in 2019. *Id.* However, unbeknownst to investors, Defendants had no basis for specifying a completion date. CW1, involved in the Centre's design and concept, stated that from the outset of construction Defendants had not defined their processes, did not know what technology they needed, did not have a clear portfolio of products they intended to make, did not know what building certifications they would need, and did not know what infrastructure they needed to comply with Good Manufacturing Practices ("GMP") requirements—all of which impacts construction. ¶ 31. In fact, according to CW1, in Spring of 2019 Defendants hired an expert to "reconfigure" the plant, requiring major modifications to existing plans already under construction, causing major delay and cost. Further delays ensued when a new President took over in Summer 2019 and ordered changes to the Centre's capacities and purpose. *CW1 confirmed that Defendants knew of all these issues and delays. Id.* CW2, an analyst of industrial processes, and CW3, a supervisor of industrial operations, CW4, Vice President of Operations and then

3
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

Research Technology and Processing Centre Project Manager, CW5, a refinement operator, and CW6, an industrial processes analyst, **_all_** corroborated CW1's account of significant known delays, major modifications, and lack of defined business plan. ¶¶ 32-33. For example, CW4, who worked on the development of the Centre's plans, initial construction, isolation of the site, breaking ground, excavation and initial installation of the steel infrastructure, described how Defendants twice changed the site of the Centre, which necessitated changes to the engineering and plans each time, causing months of delay—further exacerbated by the change in leadership in the Summer of 2019 when "conflicts emerged at the executive level." ¶ 33.

### Undisclosed Gray Mold and Flood Risk

The Company's only operational property faced additional undisclosed detriments to production. *First,* the property suffers from fungus botrytis, *i.e.,* gray mold. ¶ 35. The only way to treat gray mold is using harsh chemical fungicides, which can impact the quality and quantity of production. *Id*. Both CW1 and CW3 explained how gray mold further negatively impacts operations. ¶¶ 36-37. Due to wet conditions at the Rionegro property, they could not properly dry the cannabis plants leading to major problems with gray mold. According to CW1 and CW3, management directed that they process the gray mold infested flowers along with the healthy flowers despite negative impact on the quality of the product. *Id.*

*Second*, the property has flooding issues due to an adjacent river and lack of sufficient drainage. According to an officer at the Rionegro planning department,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

one-third of the property cannot be used because it is on a floodplain and subject to strict environmental controls. ¶ 38. CW1, CW2, CW3, CW5, and CW6, all similarly described how flooding made it difficult to gain access even to the parts of the Rionegro site not subject to the aforementioned controls, and caused operations to cease, negatively impacting productivity. ¶¶ 38-41. This occurred because Defendants had to create a provisional processing area (headed by CW1) to conduct its operations given that the Centre had not been completed, and the provisional processing area would flood during rainfall due to runoff from the river. *Id.*

### Undisclosed Related Party and Sham Transactions

Defendants' penchant for hiding material facts from investors extended beyond operational issues.  In September 2019, prior to which the Company had earned no revenue, it announced a $3 million sales agreement with General Extract ("Gen. Ext."). ¶ 43. Defendants did not disclose that: 1) Gen. Ext's registered agent is PharmaCielo's former COO; 2) the CEO of Gen. Ext.'s parent company, Redwood Green Corp. (now Andina Gold Corp.) ("Redwood"), was Christopher Hansen, former CEO and President of PharmaCielo; 3) Delon Human served as both President of Head Health and Innovation at PharmaCielo and Chairman of the Board at Redwood; and 4) two PharmaCielo directors are significant shareholders in Redwood, as is one of PharmaCielo's co-founders' son, Miguel Cock-Gomez. ¶ 44. The website domain name for Gen. Ext., www.generalxtract.com, was first registered three weeks after the Company announced the agreement, and, based on

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

Plaintiff's investigation, is no longer operable. ¶ 45. According to Dun & Bradstreet, Gen. Ext. has one employee, John Knapp, and generates only $29,735 in sales annually. *Id.* PharmaCielo's financial statements purported to identify its related party transactions but never revealed that the Gen. Ext. agreement involved related parties, as SFAS 57 requires of OTCQX traded companies. ¶¶ 35-38.

The Company also announced a distribution agreement with XPhyto in January 2020, purportedly to supply medicinal-quality cannabis extract oils and isolates to XPhyto for analysis, further processing, product development manufacturing at XPhyto's EU GMP certified facility, and then sale into the German market. ¶ 50. Defendants did not disclose that the arrangement is a sham. *Id*. XPhyto is run by a CEO with a history of running companies into the ground and stood on the brink of insolvency. ¶ 52. In the nine-month period prior to the agreement, XPhyto reported revenue of $45,000 and losses of $5,351,789. *Id*. To date, ***PharmaCielo has not delivered a single product to XPhyto***. *Id.*

**Materially Misleading Statements During the Class Period**

PharmaCielo issued press releases, and Management's Discussion and Analyses ("MD&A") with each financial statement, directing investors to its website, where it stated that its "main" growing and processing operations are in Rionegro. ¶ 54. The website portrays the property as advantageously located, listing many positive characteristics, without disclosing that it is located on a floodplain, is contaminated with gray mold, that the construction of the Centre -- which

6

Defendants promised would "enable the Company to support the sale and export of processed oil"-- faced significant delays; and that Rionegro is the Company's *only revenue producing property* given that Cauca remains idle. *Id.*, ¶ 60.  Defendants also issued numerous press releases describing their efforts in "scaling up our Colombian operations," "ramping up its oil processing capabilities," "expand[ing] the land area under active cultivation," "maturing" oil producing capabilities, expanding production capabilities, without disclosing the numerous obstacles (*see supra*) they faced to doing so. ¶¶ 56-58, 62, 65, 68, 70, 78, 80. Defendants called the property a "perfect location" without disclosing the flooding and mold issues. ¶ 86. Defendants also represented that construction of the Centre was "nearing completion," at its "final stages," repeatedly providing a completion timeframe of "late 2019," though multiple significant delays meant they could not complete construction by any predictable timeframe.  ¶¶ 60, 62, 63, 65, 68, 70.  73.

Moreover, beginning on September 25, 2019, in a Company press release and a Q&A with *Hemp Industry Daily* that appeared on PharmaCielo's website, Defendants touted a $3 million agreement with Gen. Ext. as its "initial foray into the coveted United States market," a "milestone," and as providing the Company with "a competitive edge and strong foothold in the world's largest medical CBD market." ¶¶ 64-65, 68, 78.  Though providing comprehensive details about the deal, Defendants never revealed – even when listing other related party transactions (¶ 71) -- that the deal with Gen. Ext., a company with no credible operations, involved

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

related parties. Defendants also touted the deal with XPhyto as a "significant opportunity" to "generate meaningful revenue," that "will provide a critical mass and presence of our high-grade cannabis extracts across Europe," but failed to disclose that the transaction was a sham, ¶¶ 82-84. Based on Defendants' representations, Stifel issued a "buy" rating and estimated the . "total sales opportunity of the contract could reach ~US $75-100m for PCLO." ¶ 85.

Further, Defendants discussed *current* efforts to expand its "existing presence throughout Latin America," ¶ 74, without revealing that their failure to adhere to bidding requirements in Peru stymied those efforts. The Company still has not expanded into the Peru market, which is estimated to be worth $99 million. ¶ 77.

## The Corrective Disclosures

The first hint of fraud reached the market on January 9, 2020 when *Marijuana Business Daily* ("*MBD*") published an article revealing that PharmaCielo lost a bid to supply medical cannabis in Peru because it failed to adhere to bidding requirements. ¶ 76. On this news, PharmaCielo shares dropped 4.80%. ¶ 77. The Company continued to issue misleading statements on the other topics detailed above. Then, on March 2, 2020, Hindenburg Research issued a report ("Report") revealing: (i) the Gen. Ext. deal involved related parties; (ii) sham transaction with XPhyto; (iii) the Centre's delayed construction; (iv) the flooding and mold issues in its Rionegro operation; and (v) lack of operations in Cauca. ¶¶ 88-97. The detailed revelation caused shares to drop a staggering *36.14%*, damaging investors.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

**Post-Class Period Events**

In a letter to shareholders on March 23, 2020, Defendant Attard admitted that: 1) Cauca remains idle; 2) Defendants always knew the Gen. Ext. agreement involved related parties and "conflicts of interest;" and 3) Defendants always knew that construction of the Centre would face delays. ¶ 99. Then on April 3, 2020, Redwood filed a 10-K identifying PharmaCielo as a "material related party." ¶ 100. Tellingly, no statement that PharmaCielo issued since November 25, 2019 has mentioned Gen. Ext. or Redwood. ¶ 101, fn. 4. On May 3, 2021, PharmaCielo admitted in its 2020 10-K that it has never delivered a single product to XPhyto, blaming delays in the construction of the Centre for prevented it from making the products "EU GMP compliant." ¶ 102. However, when Defendants initially announced the XPhyto deal, they represented that ***XPhyto*** was supposed to analyze, further process, and develop the product at ***its EU GMP facility*** to thereafter sell in the German market. *Id*. In the 2020 10-K, Defendants also blamed delays in the construction of the Centre for its inability to perform under an agreement with CBD Export Global. ¶ 103.

## III.   ARGUMENT

Dismissal under Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). A complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

"[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Courts must accept as true all well-pleaded factual allegations, draw reasonable inferences in plaintiff's favor, and determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). To state a claim under §10(b), Plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Schueneman v. Arena Pharm., Inc*., 840 F.3d 698, 704 (9th Cir. 2016).[2]

### A.      The SAC Adequately Pleads Actionable Misstatements

At the pleading stage, a plaintiff need not *prove* falsity, but instead only "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).[3]   A statement is

---

[2] Rule 9(b) and the PSLRA apply, but courts should not "raise the bar of the PSLRA any higher than that which is required." *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

[3] Defendants' repeat their "puzzle" pleading argument though the Court previously gave it no credence. The SAC specifies each misleading statement and omission, including dates and speakers, with reasons why those statements were misleading. Courts have repeatedly found this style of pleading permissible. *Bos. Ret. Sys. v. Uber Techs., Inc.,* 2020 U.S. Dist. LEXIS 141724, at *13-14 (N.D. Cal. Aug. 7,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). The SAC meets this standard as to all six categories of misstatements, curing each deficiency the Order identified.[4]

First, the SAC alleges that Defendants misled investors when touting the Rionegro property's advantages and efforts to scale up production, because the Rionegro facility is on a floodplain and is contaminated with gray mold. The Court dismissed these allegations for not asserting that either issue "negatively impacted Pharmacielo's business." Order at 5. The SAC newly alleges statements from five CWs that worked at the Company during the Class Period, *corroborating one another*, stating based on firsthand experience that when it rained, the entrance to the Rionegro site became *impassable* and the provisional processing area it had to set up for its operations due to delays in constructing the Centre (*see infra*), flooded. ¶¶ 38-41. This caused operations to cease and reduced productivity. *Id.* The SAC also newly alleges based on the statements of two CWs, that Rionegro had gray mold

---

2020); *In re Acadia Pharm. Inc. Sec. Litig.*, 2020 U.S. Dist. LEXIS 95464, at *12 (S.D. Cal. June 1, 2020).

[4] The Court dismissed certain misstatements on materiality grounds. While the SAC sufficiently pleads the materiality of each misstatement, a complaint should not be dismissed on materiality grounds unless the misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

issues exacerbated by wet conditions, which negatively impacted operations. ¶¶ 36-37. The CWs stated that management knew but directed that they process the infested flowers with the healthy despite its negative impact on quality. *Id.*

Second, the SAC alleges that Defendants misled investors when boasting of capacity expansion and specifying a completion date for the Centre. The Court found that "predictions about the Center's completion date are akin to…corporate 'puffery.'" Order at 6.  Defendants' statements went beyond "subjective or emotive descriptions" that generally constitute puffery. *See Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1055 (N.D. Cal. 2018).  Moreover, when statements are "specific rather than vague," they are not puffery. *See Merkamerica Inc. v. Glover*, 2019 U.S. Dist. LEXIS 231519, at \*\*26, 28 (C.D. Cal. Dec. 3, 2019)(P. Gutierrez).  In *Merkamerica,* this Court distinguished between statements "concerning timing for putting webOS and PCs and printers," that are "too specific to be dismissed as puffery," and vague or general assertions, because "a reasonable investor could have relied on Defendants' predictions regarding HP's timeline for developing webOS PCs and printers." *Id.* at \*2627. So too, a reasonable investor could have relied on specific statements concerning timing for completing the Centre, given its significance to the Rionegro operation.  GMP Securities' November 26, 2019 report stated that with the completion of the Centre, the Company's ability to "expand capacity and support its growth pipeline…would put PCLO in a position to support ~$100m+ in revenues, and transition relatively quickly to self-funding operations,"

12

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

exemplifies this point. ¶ 73.  The SAC also newly alleges Defendants' admission that construction delays *prevented the Company from performing under two contracts* touted to investors—XPhyto and CBD Export Global. ¶¶ 80, 82, 102, 103.

Third, the SAC alleges that Defendants misled investors about the Cauca property, failing to disclose that it remained idle.  The Court found that the FAC had not alleged that "a reasonable investor would have changed his opinion of the value of PharmaCielo if Defendants listed the Rionegro Property as their "only" property." Order at 6.  However, with the SAC's new allegations detailing the negative impact of the flooding, mold, and construction delays plaguing operations in Rionegro, the fact that PharmaCielo's only other property in Colombia *did not operate at all* would have altered the total mix of information for any reasonable investor.  *See Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2017 U.S. Dist. LEXIS 122725, at *26 (C.D. Cal. Jan. 17, 2017)(P. Gutierrez). ¶¶ 30-42.

Fourth, the SAC alleges that Defendants misled investors by failing to identify Gen. Ext. as a related party transaction.[5]  There is no question that the General Extract deal is a related party transaction. *See SOF supra*. Defendant Attard *admitted* to shareholders on March 23, 2020 that the transaction involved related parties and created "conflicts of interest. ¶ 99.  A few days later, Gen. Ext.'s parent identified

---

[5] Defendants are wrong that "Plaintiffs pivot and claim…the agreement was a sham all along." Def. Br. at 15.  These allegations are not new; they provide context as to why investors would have found the involvement of related parties important.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

PharmaCielo as a "material related party" in its 10-K. ¶ 100. Defendants had a duty to disclose pursuant to SFAS 57 **and** because they opted to raise the topic of related party transactions (¶¶ 49, 71).[6] *Brown v. China Integrated Energy, Inc.*, 2012 U.S. Dist. LEXIS 196448, at *44 (C.D. Cal. June 12, 2012) (falsity adequately pled where defendants failed to disclose a related party transaction); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012).

The SAC alleges why the involvement of related parties would have altered the "total mix of information," *materiality*, as there appears to have been no legitimate basis for the deal. **Defendants' now admit that Gen. Ext. has no operations**. Def. Br. at 16, n. 11. Not a single statement that PharmaCielo issued **since November 25, 2019** (two months after touting the deal) has mentioned Gen. Ext. or Redwood. ¶ 101, fn. 4.  The domain for Gen. Ext., www.generalxtract.com, was registered three weeks after the Company announced the deal and is no longer operable. ¶ 45.  According to Dun & Bradstreet, Gen. Ext. has one employee, PharmaCielo's former COO, and generates only $29,735 in sales annually. *Id*.

The significance of the Gen. Ext. statements are further illustrated by GMP Securities' September 25, 2019 report calling the deal, "a definite **milestone**," "**an important tenet of our investment thesis**," and stating that the $3 million agreement

---

[6] Plaintiff is not required to show that an "insider extracted a material benefit" or plead unfair terms; the SAC pleads the duty to disclose. Def. Br. at 16, fn. 12.

14

represents "*~60% of our Q4/19 forecast for PCLO of ~$5m…*" ¶ 67 (emphasis added). These metrics show how the market would in turn "devalue[]" the deal, Order at 7. Given that prior to announcing the Gen. Ext. deal, the Company earned no revenue, this is the type of information "a reasonable investor would consider ... important in deciding whether to buy or sell securities." *Melcher v. Fried*, 2018 U.S. Dist. LEXIS 205252, at *36 (S.D. Cal. Dec. 4, 2018).

<u>Fifth</u>, the Court found statements regarding PharmaCielo's efforts to expand its *existing presence* in Latin America inactionable stating that "there are no facts to suggest that PharmaCielo **would not be able to** expand its presence in Latin America merely because it lost a single bid in Peru." Order at 8 (emphasis added). That is not the claim. The SAC alleges that Defendants misled investors regarding their **current** efforts -and **current** success of those efforts- in expanding its Latin American presence. The bidding process in Peru, where the market for medical cannabis is estimated at $99 million (¶ 77), represented a material part of those expansion efforts. PharmaCielo did not earn revenue until late 2019, and thereafter only earned revenue from one Latin American country- Colombia- for the remainder of the Class Period. At the time Defendants touted their expansion efforts, they knew they'd lose the bid in Peru for not adhering to requirements. Their disqualification came to light only **three weeks** after Defendant Attard touted the Company's role in "building the medical cannabis industry in Latin America" and expansion of its "existing presence throughout Latin America." ¶ 74. These statements triggered a duty to reveal their

15

failure to adhere to bidding criteria for a potentially lucrative foray into the Peruvian market, a market they to date have not succeeded in penetrating. ¶ 77. The decline in stock price following the revelation further demonstrates materiality. *Longo v. Osi Sys.*, 2021 U.S. Dist. LEXIS 63773, at **20-21 (C.D. Cal. Mar. 31, 2021).

Sixth, the SAC alleges that Defendants misled investors regarding XPhyto. XPhyto is nearly insolvent and led by a CEO with a history of running companies into the ground.  Without disclosing this, Defendants announced the deal in January 2020, hailing the deal as "a significant opportunity," a "significant milestone," "to generate meaningful revenue, that "will provide a critical mass and presence of our high-grade cannabis extracts across Europe for medicinal, therapeutic and wellness purposes." ¶ 83. The Court held that the FAC "fails to allege facts establishing that the transaction was actually a sham." Order at 9.  The SAC newly alleges that ***PharmaCielo has not earned a single dollar or delivered a single product pursuant to this agreement to date***. ¶ 102.  The SAC alleges that when Defendants reported full year 2020 *post-Class Period*, they blamed delays in the construction of the Centre for failing to perform under the XPhyto agreement, claiming those delays meant they could not make their product EU GMP compliant for XPhyto to sell in the German market. ¶ 102.  However, Defendants told investors *during the Class Period* that they had done the XPhyto deal in the first place so that ***XPhyto*** could take PharmaCielo's medicinal-quality cannabis extract oils and isolates and conduct "analysis, further processing, product development and manufacturing ***at its***

16
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

***European Union Good Manufacturing Practice-certified ("EU GMP") facility …***

and thereafter for sale into the German market." *Id.* (emphasis added).   This contradiction further demonstrates that the agreement is a sham.[7]

## B.      The SAC Adequately Pleads Scienter

The relevant inquiry for scienter is whether the allegations, "taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. The inference "need not be irrefutable … or even the 'most plausible.'" *Id*. at 324. If the inference is "cogent and at least as compelling as any opposing inference"…"the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig*., 2014 U.S. Dist. LEXIS 183034, at *27 (C.D. Cal. Aug. 4, 2014).  Defendants incorrectly states *three times* that the Order does not address scienter. Def. Br. at 1, 7, 8. The Court found that the FAC had not pled scienter only as to two categories of misstatements-

---

[7] Defendants repeat the same unsupported conclusory arguments that certain misstatements are accurate, optimism, opinions, or forward looking, though the Order gave them no credence. Def. Br. at 9-10. The statements they argue are "literally accurate" are misleading for what they ***omit***. *In re Amgen Inc. Sec. Litig*., 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008).  Moreover, their statements regarding Gen. Ext. purported to convey ***fact***, not ***optimism***, *e.g.,* the elements of its business that "position the Company to capture market share" and give it a "competitive edge."  Then, oddly, Defendants cite ***a GMP analyst's*** statements, pled to show the significance of the Gen. Ext. deal to the market, and argue they are inactionable opinion. Def. Br. at 9.   Additionally, in arguing that "additional cultivation expansion expected," is forward-looking, Defendants ignore the *next sentence,* which makes clear the SAC is challenging the incompleteness of statements touting the Rionegro property's advantages given undisclosed issues. Def. Br. at 10.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

statements regarding the Centre and expansion efforts in Latin America. Order at 6, 8, 10. The SAC cures these deficiencies.

*Statements Regarding the Centre.* The SAC newly alleges that Defendants *always knew* construction faced significant delays and that their 2019 completion date had no reasonable basis. *Six CWs*, corroborating one another, detailed many significant factors known to Defendants– including *inter alia* lack of business plan, site changes, major plan modifications, the hiring of an expert in Spring 2019 and a leadership change in Summer 2019-- that caused construction to restart multiple times and led to many months of expected delay. ¶¶ 31-33. It is not fathomable that the c-suite Individual Defendants, who **worked on site**, had no part in integral decision-making regarding the Centre, upon which the Rionegro operation hinged. Without the Centre, the Company had to rely on the provisional processing area, with its pitfalls, and could not perform contractual obligations. ¶¶ 102-03.

Defendants' attacks on the CW allegations are meritless. The SAC alleges titles, responsibilities and employment dates "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," ¶¶ 31-41. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). *The CWs all worked at the Company during the short Class Period* (belying Defendants' claim of allegations "unmoored in time," Def. Br. at 7). The CWs all had titles (mostly senior) connoting responsibilities that provide a basis for their *firsthand knowledge* (*e.g.,* Head of Production, involved in the design of the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

Centre and head of the provisional processing area, a Vice President of Operations *and* Centre Project Manager, involved in all aspects of planning and construction of the Centre). *See In re Myriad Genetics, Inc.*, 2021 WL 977770, at *17-18 (D. Utah Mar. 16, 2021) (considering allegations about what other executives knew to determine whether complaint pled scienter against the defendants). Moreover, the six CWs corroborate one another. *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (finding scienter based on CW statements that corroborate one another). That the CWs do not state that they interacted directly with a Defendant does not detract from their contribution to the scienter inference. *See Quality Sys.*, 865 F.3d at 1144 (crediting CWs who had no contact with defendants); *Robb v. Fitbit, Inc.*, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) (same).

***Statements Regarding Latin American Expansion***. Until late 2019, PharmaCielo *earned no revenue*. For the rest of the Class Period, PharmaCielo earned revenue from *only one Latin American country*- Colombia. At the end of 2019, Defendant Attard spoke of PharmaCielo's focus on "expanding our existing presence throughout Latin America." ¶ 74. A logical inference therefore is that Defendants would have been aware of the Company's bid in Peru, a market worth an estimated $99 million. ¶ 77. It is also implausible that Defendants did not know they could not win the bid. *See Hatamian*, 87 F. Supp. 3d at 1161 ("When assessing allegations holistically, the Court views circumstances that are probative of scienter with a practical and common-sense perspective."). The Company did not *lose* for an

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

unforeseen reason; it was *disqualified* for not adhering to bidding criteria. ¶ 76.

*Admissions*: Defendants admitted to always knowing that the Gen. Ext. deal involved related parties and conflicts of interest, to knowing that Cauca is idle (despite promises in 2017of building facilities there, with no update to the contrary), and to always knowing about and expecting delays in constructing the Centre. ¶ 99.[8] Their admissions create a compelling inference of scienter. *See, e.g., Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551 (S.D.N.Y. 2017).[9]

*Additional Allegations of Scienter*: PharmaCielo's has *one* operation at its "headquarters" in Rionegro, and earned no revenue until late 2019. ¶¶ 26-27, 30. *See In re Iso Ray Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1079 (E.D. Wash. 2016)(finding scienter where allegations concerned company's core operation). The Individual Defendants worked **on site** in Rionegro where flooding and mold negatively impacted operations, and in the case of flooding, *stopped operations altogether*. They were responsible for operations and played a critical role in its management.

---

[8] Defendants now also admit that General Extract has no operations. Def. Br. at 16.
[9] Unable to deflect from their admissions or post-Class Period allegations of scienter, Defendants misquote *In re SolarCity Corp. Sec. Litig.*, as stating that scienter **requires** allegations of "contemporaneous…conditions." 274 F. Supp. 3d 972, 1009 (N.D. Cal. 2017). *SolarCity* is clear that this is simply "one way" to demonstrate scienter. Moreover, these admissions- though post-Class Period- concede to knowledge *during the Class Period*, *i.e.* when they made their misstatements. *See In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *7 (N.D. Cal. June 1, 2020) (finding scienter and refusing to "'close [its] eye'" to defendants' "post-mortem diagnosis of the problems that led to false financial statements.").

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

*N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) ("[A]llegations of recklessness have been sufficient where defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."); "[T]hat [] defendants published statements when they knew facts suggesting the statements were inaccurate … is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005).

Regarding Gen. Ext., the sheer size of the $3 million deal suggests scienter given the Company's lack of prior revenue. The barest diligence would have uncovered the involvement of its former CEO, former CFO, a current President, and two Directors. *See In re Daou Sys., Inc.,* 411 F.3d 1006, 1016 (9th Cir. 2005). That Gen. Ext.'s parent company listed PharmaCielo as a "material related party" in its 2019 10-K also contributes to the scienter inference. Defendants' scienter is demonstrated by XPhyto's troubling history, lack of performance under the contract to date, and the contradictions between Defendants' initial description of the reason for the deal and their recent announcements explaining their lack of performance.

The SAC's scienter allegations collectively raise an inference of scienter at least equally as compelling as any opposing inference.

**C.     The SAC Adequately Pleads Reliance**

Reliance "is a fact-intensive issue not proper for determination as a matter of law at the pleading stage…" *Maz Partners v. First Choice Healthcare Sols., Inc*., 2019 U.S. Dist. LEXIS 184611, at *48 (M.D. Fla. Oct. 16, 2019).  Nonetheless,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

reliance is sufficiently pled.  Plaintiff's certifications (¶ 14; ECF No. 16-4), establish temporal proximity between the misstatements and their purchases, demonstrating reliance.  Defendants are wrong that the market for OTCQX securities can never be efficient; nor have they provided any basis for insisting that Plaintiff *prove* market efficiency at the pleading stage. *See In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 762-63 (N.D. Ohio 2003) (stock trading on the OTC, "traded on an efficient market" and ruling that "plaintiffs need not *prove* that the market is efficient at the pleading stage").  The SAC *pleads* that PharmaCielo actively traded on the OTCQX, an efficient market, and proffers allegations in support. ¶¶ 104-05, 110-11.

Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because this is "primarily a nondisclosure case." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2019 U.S. Dist. LEXIS 166832, at *314 (N.D. Cal. Sept. 26, 2019); ¶ 112.  This case is premised on Defendants' ***failure to disclose*** flooding and mold issues, construction delays, that the Gen. Ext. deal involved related parties, that XPhyto is a sham, that Cauca is idle, and that the Company failed to adhere to bidding requirements in Peru. ¶¶ 8, 41, 44, 46, 48, 52, 55, 61, 63, 67, 69, 75.  Even the affirmative misstatements alleged in the SAC "are tethered to the[se] omission[s] that [are] at the heart of the case." *Volkswagen*, 2019 U.S. Dist. LEXIS 166832, at *315-16.  While arguing that this is not an omissions case, Defendants concede multiple times that the SAC alleges omissions. *See, e.g.,* Def. Br. at 8 ("…because

22

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

Plaintiffs plead an omissions theory of falsity...").  Reliance is sufficiently pled.

### D.    The SAC Adequately Pleads Loss Causation

Loss causation is subject to the less rigorous pleading requirement of Rule 8(a)(2) and is "not meant to impose a great burden upon a plaintiff."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The SAC alleges that shares fell in response to new information in the *MBD* article and Report revealing the fraud.  ¶¶ 76-77; 88-96. Such allegations suffice for loss causation. *Constr. Workers Pension Tr. Fund v. Genoptix, Inc*., 2013 U.S. Dist. LEXIS 49716, at *24-25 (S.D. Cal. Mar. 22, 2013).[10]  Defendants' citation to *Eng* is misleading.  *Eng* did not hold that loss causation must be "predicated on double digit declines." Def. Br. at 24.  *Eng* declined to find loss causation because *all the corrective disclosures* caused "scanty .79% to 2.71% declines."  *Eng v. Edison Int'l*, 2017 U.S. Dist. LEXIS 69196, at *11 (S.D. Cal. May 5, 2017).  Even the partial disclosure caused a decline almost twice the size of the largest decline in *Eng* and the final disclosure caused a ***36.14%*** decline.

Defendants also argue that the Report is based on public information, proffering an inappropriate truth on the market defense. *In re Amgen Inc. Sec. Litig*., 2014 U.S. Dist. LEXIS 183034, at *50; *Children's Hosp. & Med. Ctr. Found. of Omaha v. Countrywide Fin. Corp*., 2011 U.S. Dist. LEXIS 166291, at *25 (C.D.

---

[10] Plaintiff had no obligation to plead that the decline *did not result* from parts of the Report not quoted in the SAC. *See City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH. Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

Cal. Aug. 22, 2011).  Regardless, Hindenburg stated that it uncovers "hard to find information from atypical sources" and the Report is based on facts not easily obtainable by investors (*e.g.*, surveillance photos of Colombian properties). ¶ 96. The Report specifically stated, "we went this deep down the rabbit hole." ¶ 95. *See Snellink*, 870 F. Supp. 2d at 942 ("A short seller report may be used to establish loss causation," even based on public information); *Scott v. ZST Dig. Networks, Inc.*, 2012 U.S. Dist. LEXIS 19392, at *32 (C.D. Cal. Feb. 14, 2012).  The Report also includes non-public information (*e.g.,* interviews), and contains analysis/conclusions that had not been done previously by any market participant. *In re BofI Holding, Inc. Securities Litigation*, 977 F.3d 781, 794-95 (9th Cir. 2020).

Moreover, the magnitude of the decline demonstrates that investors had no awareness of the supposedly public facts on which the Report is based. *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 515 (S.D.N.Y. 2010).[11]

### E.   Section 10(b) Covers Plaintiff's Claim

Plaintiff's purchases qualify as "domestic" transactions under either prong of the test in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010).  First, PharmaCielo traded in the U.S. on the OTCQX market, which is part of the OTC Markets Group, under the trading symbol "PCLOF," and previously "PHCEF."  ¶¶

---

[11] The SAC has sufficiently alleged a viable Section 10(b) claim.  As such Defendants' motion to dismiss the Section 20(a) claim fails. *Constr. Workers Pension Tr. Fund*, 2013 U.S. Dist. LEXIS 49716, at *25.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

16, 46, 53, 104, 105, 110.  Both members of the Lead Plaintiff group purchased their PharmaCielo securities on this market. *See* ECF No. 16-4.  Courts have held that alleging a company is listed on the OTCQB market "constitute[s] an allegation that [the company] is traded on a domestic exchange," satisfying *Morrison*.  *Rubenstein v. Cosmos Holdings, Inc*., 2020 U.S. Dist. LEXIS 121773, at *29 (S.D.N.Y. July 10, 2020). *See also SEC v. Ficeto*, 839 F. Supp. 2d 1101 (C.D. Cal. 2011).  Unlike other OTC markets, where companies do not need to take any action for broker-dealers to quote their securities, to upgrade to the OTCQX [and OTCQB] market[s], a company must pay fees and comply with additional disclosure requirements, like companies listed on other domestic exchanges. The OTCQX exchange, with its heightened requirements and N.Y. headquarters, is therefore a "domestic exchange" under *Morrison*. *See United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2014). Second, Plaintiff can show irrevocable liability, though this is a fact intensive inquiry not suited for a motion to dismiss. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68, 70 (2d Cir. 2012).  Lead Plaintiffs reside in and transacted in the U.S. via TD Ameritrade, a U.S. broker with only U.S. offices. These allegations suffice under *Morrison. See Giunta v. Dingman*, 893 F.3d 73, 80 (2d Cir. 2018); *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018).[12]

---

[12] In the event the Court dismisses some or all of the claims alleged, Plaintiffs respectfully request leave to replead.  *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

## IV.   CONCLUSION

Therefore, for the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.

Dated: October 4, 2021

Respectfully submitted,

**POMERANTZ LLP**

*s/ Tamar A. Weinrib*
Jeremy A. Lieberman
(admitted *pro hac vice*)
Tamar A. Weinrib
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
taweinrib@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(admitted *pro hac vice*)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

***Lead Counsel for Plaintiff***

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC

Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

***Additional Counsel for Howard Anderson***

**THE SCHALL FIRM**
Brian Schall
Rina Restaino
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 877-590-0482
brian@schallfirm.com

***Additional Counsel for Pamela Que***

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT, CASE NO.: 2:20-cv-02182-PSG-JC